

FILED
KENNETH J. MURPHY
CLERK

03 NOV -5 PM 4:21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TRAVEL LODGE HOTELS, INC., | : | CASE NO. C-1-01-784 |
| Plaintiff, | : | (Judge Weber) |
| v. | : | |
| GOPAL GOVAN, | : | DEFENDANT GOPAL GOVAN'S PROPOSED FINDINGS OF FACT AND |
| Defendant, | : | CONCLUSIONS OF LAW |
| v | : | |
| CINCINNATI TRAVEL LODGE, | : | |
| Cross-Claim Defendant. | : | |

Defendant Gopal Govan ("Mr. Govan") respectfully submits his proposed findings of fact and conclusions of law pursuant to the Court's Scheduling Order dated August 2, 2002. For the Court's convenience, the delineation of proposed factual findings and legal conclusions do not include those proposed facts and legal conclusions previously submitted by Plaintiff Travelodge Hotels Inc. ("THI") to which Mr. Govan has already agreed.

## PROPOSED FINDINGS OF FACT

1. In October of 1999, Mr. Govan received a telephone call from a woman named Sue Eastman, a representative of Third Party Defendant, Cincinnati Travelodge. Cincinnati Travelodge owned motel located at 3244 Central Parkway in Cincinnati, and was interested in selling the same.

2. Mr. Govan had previously purchased hotel properties through Ms. Eastman and

the purpose of her call on this occasion was to gauge his interest in the purchase of the subject property.

3. The price quoted to Mr. Govan by Ms. Eastman for the purchase of the motel was $1.4 million. Interested, Mr. Govan requested and was given additional information regarding the property. Specifically, he was provided with certain information pertaining to the financial condition of the motel, including profit and loss statements.

4. Mr. Govan also requested and was provided with copies of what were represented to him as the two most recent Quality Assurance Reports prepared by THI. The first report was dated September of 1998 and the second June of 1999. Each of these reports indicated that the subject property had received a "passing" score from THI. These reports thus verified to Mr. Govan that the subject property was in a condition acceptable to the franchiser, THI.

5. On January 5, 2000 Mr. Govan entered into an agreement to purchase the subject property from Cincinnati Travelodge. Under the terms of his contract with Cincinnati Travelodge Mr. Govan was specifically required to obtain the franchise and license agreements necessary to continue to operate the motel as a Travelodge. That is, as a prerequisite to his completion of the purchase of the motel, he was obligated to obtain the approval of THI to become a Travelodge franchisee.

6. While the purchase contract had been signed in January, a number of months would pass between the time that he signed the purchase agreement and the time that the closing was to take place. During this timeframe, the property would remain under the control of the seller (Cincinnati Travelodge) and Mr. Govan would have no input as to how the property would be managed or maintained.

7. Aware of his prospective obligation to ensure that the property adhere to certain

standards established by THI, Mr. Govan was adamant that he have some assurance that the property would be maintained to THI's satisfaction before the closing occurred.

8. To this end, he specifically informed Sue Eastman that a Quality Assurance ("QA") inspection of the property would be needed prior to the closing. Ms. Eastman noting that this request could be fulfilled, informed Mr. Govan that she would contact THI and have a representative from their quality assurance department call him. Thereafter, as promised, Mr. Govan received a phone call from the THI quality assurance department. During this conversation, the THI representative confirmed that the QA inspection would be performed as requested.

9. On or around March 1, 2000, Govan was provided by THI with a "punch list" which described certain changes and up-grades to be made to the motel once Govan had obtained a License to use the Travelodge name and began operating the motel. At the time that he received this punch list, Mr. Govan had every reason to believe that the motel was in a condition satisfactory to THI. This belief was based on the fact that the prior QA reports that he had received clearly reflected that the motel had received "passing" scores from the franchisor, THI.

10. It is true that the punch list, by its terms set forth a schedule as to when certain improvements were to occur. However, Mr. Govan spoke with THI's quality assurance department who ensured him that they would be flexible with regard to this schedule.

11. On March 8, 2000, Mr. Govan entered into a License Agreement with THI. Unbeknownst to Mr. Govan, however, his belief that the motel was in a condition acceptable to THI was not correct. This is because, on February 21, 2000—a mere two weeks before the license agreement was signed—THI had inspected the motel. On this occasion, the motel received a failing score. THI never informed Mr. Govan of this fact.

- 3 -

12. Mr. Govan thus proceeded toward the closing under a misapprehension. That is, he operated (a) under the mistaken belief that the motel had passed its most recent quality assurance inspections and; (b) with the confidence that an additional QA inspection would be performed before he closed, verifying that the motel remained in a condition acceptable to THI. This misapprehension is critical when one notes that, by its terms, the license agreement was not to take effect until after Mr. Govan had taken possession of the motel —that is, after closing.

13. The closing of the motel was scheduled to take place on May 12, 2000. On May 2, 2000, in accord with Mr. Govan's request, a THI inspector named Shane Blankenship visited the motel in order to inspect it. After his arrival at the motel, Mr. Blankenship identified himself as a Travelodge quality assurance inspector, and asked to speak to the manager. It is THI's policy that the QA inspector allow a motel's on-site manager to accompany him as he performs his examination of a premises. Mr. Blankenship was eventually introduced to a man who identified himself as the manager.

14. Upon learning of Mr. Blankenship's identity, the manager informed Mr. Blankenship that the motel had been sold and that no inspection was necessary. Mr. Blankenship informed the manager that any refusal to permit the performance of the inspection would result in the motel receiving a failing score. Unfazed, the manager reiterated his stance that no inspection was necessary, and turned Mr. Blankenship away.

15. In spite of the fact that Mr. Govan had requested the inspection specifically in contemplation of the consummation of his purchase of the motel, Mr. Blankenship left the premises without conducting the inspection. THI never informed Mr. Govan of this fact.

16. Before leaving, however, Mr. Blankenship prepared a document that reflected the fact that he had been refused admittance to perform the inspection, and that the motel had

- 4 -

received a failing grade. However, neither Cincinnati Travelodge nor THI provided Mr. Govan with any documentation that the motel had failed this inspection.

17. On the day of the closing, Mr. Govan visited the motel. At this time, Mr. Govan noted, from a cursory review of the exterior and common areas, that its condition had worsened from his prior visits. Mr. Govan, recalling that he had requested that an inspection of the premises be undertaken, spoke with the motel's then on-site manager, Tom Fuller. Fuller informed Mr. Govan that the motel had passed the most recent inspection. Fuller's representation verified to Govan that the inspection he had requested had indeed been performed. Pressed for time, Govan left the motel and headed to the closing. There, he consummated the purchase of the motel.

18. It was only after the closing, however, that Mr. Govan became aware that THI had never fulfilled its promise to inspect the motel on his behalf. It was also after the closing that Mr. Govan came to learn the actual abhorrent condition of the motel. Among other things, a number of the individual room air conditioners were broken, many rooms were missing television sets and clock radios and the phone and reservation systems were not working. Also, in a number of rooms, prior to closing, toilets had overflowed resulting in a foul smell that, in spite of cleaning efforts, persisted for some time.

19. Upon taking possession of the motel, Mr. Govan began to make improvements to the motel. Specifically, he resurfaced the parking lot, replaced carpeting, painted the interior and exterior of the motel and replaced exterior railings. These improvements did not prevent the motel from failing additional inspections, however. The motel was inspected by THI on August 14 and December 13, 2000. The motel failed each of these inspections, and Mr. Govan's Travelodge license was thereafter terminated.

## PROPOSED CONCLUSIONS OF LAW

20. It is axiomatic that fraud taints every transaction into which it enters, and vitiates contracts that would not have been entered into but for such fraud. *Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 95 Ohio St.3d 367 768 N.E.2d 619 (2002); *Eller v. Turvene*, 71 Ohio Law Abs. 375; 131 N.E.2d 407 (1955). Therefore, to the extent that Mr. Govan is able to demonstrate that his franchise agreement with THI was the product of fraud, the franchise agreement will properly be regarded as a nullity.

21. A duty to speak may arise where one party stands in a fiduciary position relative to another in the context of a business transaction. The existence of a duty to speak does not necessarily depend on the existence of a fiduciary relationship. *Central States Stamping Co. v. Terminal Equipment Co., Inc.*, 727 F.2d 1405 (6th Cir. 1984). Such a duty "may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence." *Id.* "Full disclosure may also be required of a party to a business transaction 'where such disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts.'" *Blon v. Bank One*, 35 Ohio St. 3d 98, 101, 519 N.E.2d 363 (1988). Stated another way, "nondisclosure of a fact will become the equivalent of fraudulent concealment when it is the duty of the person to speak in order to place the other party on equal footing with him." *Davis v. Sun Refining and Marketing, Co.*, 109 Ohio App. 3d 42, 55, 671 N.E. 2d 1049 (1996).

22. The fact is that, as of February 2000, the motel was in an unacceptable condition from THI's perspective. This information was critical to the transaction, and its disclosure was necessary to place Mr. Govan on an equal footing with THI in the context of the signature of the license agreement. THI failed to disclose it, however. THI compounded this failure some months

later when its quality assurance representative, Shane Blankenship was turned away from the motel by its current Travelodge manager. Once again, THI remained silent, and did not inform Mr. Govan that the motel had failed yet another QA exam. As noted above, at the time that Mr. Blankenship was turned away, the closing had not yet taken place and Mr. Govan had not yet taken possession of the motel. Thus, the license agreement was not yet operative.

23. THI's silence led Mr. Govan to close on the motel under a misapprehension that the motel was in an "passing" condition. This impression was created by a partial revelation that the motel had passed two inspections that Mr. Govan believed to be the most recent. From these facts, a jury may readily determine that THI was under a duty to speak in order to arm Mr. Govan with critical material facts and to place him on footing equal to its own before he became obligated under the terms of the license agreement. A jury may determine that THI's failure to speak amounted to fraud. Summary judgment as to Mr. Govan's fraud claim is thus not warranted and is hereby denied.

24. Summary judgment as to the issue of justifiable reliance is not appropriate either. This is because "the question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties." *Togo International v. Mound Steel Corp.*, 106, Ohio App. 3d. 282, 286, 665 N.E. 2d 1160 (1995); *Lepra v. Fuson*, 83 Ohio App. 3d 17, 613 N.E. 2d 1060 (1992). Stated another way, establishing justifiable reliance does not require a showing that the party's reliance conformed to what a 'reasonable man' would have believed. *Amerifirst Savings Bank of Xenia v. Krug*, 136 Ohio App. 3d 468, 496, 737 N.E. 2d 68 (1999). Instead, the question of whether justifiable reliance exists involves a fact-based inquiry into the circumstance of the case. *Lepra*, 83 Ohio App. 3d at 26. Such a "fact-based" inquiry is clearly the province of the jury. Summary judgment on Mr. Govan's fraud claim is thus precluded and is hereby denied.

25. As to the issue of fraudulent intent, courts have routinely recognized that the provision of "direct proof may be impossible." *Wagner v. Galipo*, 97 Ohio App. 3d 302, 309, 646 N.E. 2d 844 (1994). Thus, given the difficulty in finding such "direct proof" of fraud, courts readily examine the circumstances surrounding the transaction and the relationship of the parties involved to discern whether fraudulent intent may be said to exist. *Id; Stein v. Brown*, 18 Ohio St. 3d 305, 308-309, 480 N.E. 2d 1121 (1985). Through an examination of the circumstances surrounding the present case, a jury may well determine that THI fraudulently intended to conceal from Govan the reality that it considered the motel to be existing in a failing state at the time of both the license agreement and closing.

26. This is because the terms of the purchase agreement between Mr. Govan and Cincinnati Travelodge were no doubt appealing to THI. That is, the purchase agreement obligated Mr. Govan to "stand in the shoes" of Cincinnati Travelodge as franchisee, and continue to pay royalties and fees for fifteen years. Reasonable jurors could conclude that THI had an incentive to ensure that the closing occurred, and Mr. Govan's fifteen year term began. Thus, when viewing the facts within this context, the jury my very well determine that THI acted with the intent to defraud in failing to disclose to Mr. Govan the facts that: (a) the motel had failed a February 2000 quality assurance inspection; and (b) the motel had failed a second QA inspection prior to closing when Mr. Blankenship had been turned away from the property. For this reason, summary judgment on Mr. Govan's fraud claim is inappropriate and is denied.

27. Given that genuine issues of material fact remain as to Mr. Govan's fraud claim, genuine issues of fact remain as to whether the license agreement constitutes a valid and enforceable contract. Thus, any award of damages in ostensible compensation for Mr. Govan's alleged breaches thereof would be, at best, premature. Therefore, the Court denies THI's motion

for summary judgment on its claims for damages under the license agreement. Specifically, the Court denies THI's claims for the payment of accrued royalites and recurring fees. The Court likewise denies summary judgment as to THI's claims under the Lanham Act, and also denies summary judgment as to the issue of Mr. Govan's responsibility for the payment of attorneys fees.

28. Notwithstanding that material facts exist as to the enforceability of the license agreement, the Court finds, as a matter of law, that the liquidated damages provision contained therein is invalid. It is true that New Jersey law gives favorable treatment to liquidated damages clauses. *DMH Indus. Inc. v. Central Port Warehouses, Inc.*, 127 N.J. Super. 499, 318 A.2d 20, 22-23 (1973). Such a clause is valid where it constitutes a reasonable forecast of the provable injury resulting from the breach, and where harm is incapable or very difficult to accurately estimate. *Wasserman's Inc. v. Middletown*, 137 N.J. 238, 645 A.2d 100, 106-07 (1994). However, even in light of the "presumptive validity" of such clauses, they are not automatically enforced where they may be deemed punitive.

29. Pursuant to the terms of the license agreement, THI seeks liquidated damages based on a flat fee ($2000) multiplied out by the number of rooms in the motel (71). The liquidated damages sum claimed is thus $142,000. It must be noted that that a key element in determining whether a liquidated damages provision is its reasonableness when measured against the actual damages sustained. The Court concludes, as a matter of law, that the damages claimed by THI bear no reasonable relationship to the damages that it has actually sustained—if any. The calculation invoked by THI relies on a 100% occupancy rate multiplied by a factor ($2000) woven out of whole cloth. I therefore hold that the liquidated damages provision contained in the license agreement at issue in this case constitutes an unenforceable penalty. Therefore, to the

extent that the license agreement is deemed enforceable, THI will be required to prove, at trial, the amount of damages that it has sustained.

|  |  |
|---|---|
| OF COUNSEL: | Respectfully Submitted |
|  |  |
| WOOD & LAMPING LLP | *[signature]* |
|  | Eric C. Holzapfel |
|  | James D. Houston |
|  | 600 Vine St. Suite 2500 |
|  | Cincinnati, Ohio 45202 |
|  | (513) 852-6000 |
|  |  |
|  | Trial Attorneys for Gopal Govan |

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the forgoing has been served via ordinary U.S. Mail, this 6th day of May, 2003, upon the following:

Steven A. Goldfarb
Nancy A. Oliver
3300 BP Tower
200 Public Square
Cleveland, Ohio 44114-2301
Attorneys for Plaintiff,
Travelodge Hotels, Inc.

Alan J. Statman
Brian Giles
2900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202
Attorney for Third-Party Defendant
Cincinnati Travelodge

                                                                   James D. Houston